Good morning. Welcome to Alaska. We appreciate you coming up here. It's a treat for us. As someone who doesn't visit Anchorage very often because we call Anchorage the closest big city to Alaska, I'm from Juneau and flew up here with flooding going on right now, some sort of tsunami that happened down at the end of a fjord with a 100-foot wave of water, a lot of crazy things going on. My family's okay, but a lot of friends and clients are packing sandbags as we speak. This case involves a fundamental question about vessel liability under the Longshoreman Harbor Workers' Compensation Act. Can a vessel escape the turnover in active control duties by claiming stevedores assume all risk of icy conditions while simultaneously retaining exclusive control over ice abatement? The District Court's decision rests on a foundation of contradictory evidence and legal error that requires reversal. Now, our arguments are stated in the briefs, and I don't want to repeat those, but Justice Owens, you asked about Judge Kindred, and I want to just be up front and say I'm here because of concerns with the way this decision was rendered and with his impartiality and fairness and the way he applied the law. This is a case where, and I have no complaints about opposing counsel. They were absolutely professional all the way along. I was happy with the trial evidence when we finished, with the exception that Judge Kindred would not let me cross-examine the key witness, Gomera, as to his opinion. That's not an issue that you've raised on appeal, however, as I read your brief. It's not an issue because it's just part of the story that happened at the trial. Can I ask you a specific question to focus on the issues? You're claiming there was no turnover, correct? Yes. Okay, so the problem is, as I understand it, I mean, there's always going to be some ice, or, well, I'm not entirely sure I understand the difference between slippery conditions and ice, but there's always going to be either slippery conditions or ice when this is being unloaded at midnight, or 3 a.m. in this case, or loaded, packed up. Under your theory, there would never be a turnover, and that just seems pretty dramatic because you would say, as I understand it, the fact that there was ever the possibility of ice and that they retained responsibility for taking away the ice prevents turnover, so there would never be any turnover. Judge, I don't think that's the case at all. They could turn over the hold, as it is, and say, hold's icy. And Murphy, the owner of the stevedoring company, in his declaration said, he said, we are responsible for abating the ice. That's what he said under oath. Doesn't that roll into your second argument of active control? I mean, that's the problem that I have. You sort of seemed, and I think Judge Kindred sort of pointed this out, that you were conflating the two arguments. I mean, the active control, there's a separate question about what constitutes active control, and I don't think the Ninth Circuit's spoken directly on that, but other circuits have, and they've said it has to be more than creating a plan for where you pack this stuff, and it has to be more than just de-icing. It has to be actual control over the process of how the loading and unloading happens. Your Honor, the key to, I think, this case is ER 103. And ER 103 is a document that was not initially produced in disclosures, but we said there must be some ship's log tracking what happened here. This document came to us in Korean, and fortunately, since my wife is from Seoul, I could get an informal translation, and it confirmed something, which is exactly what Mr. Nystrom had said. Was this presented in trial? Yes, over and over again. Including the translation? Yes, this is the translated document here. And this translated document, which is a ship's record produced after the event where the ship's captain was explaining what happened, said two important things. It said, one, that the decks, it was slippery or icy, and it said that the crew members were actively abating, acting in de-icing at the time this occurred, and four crew members were there and saw Mr. Nystrom fall. I'm not sure there's any dispute that... Well, there was dispute. Mr. Gamara said there were not four crew members there. He said they were not abating ice. He said that was not occurring at all. But this is what the ship said. This is what the captain and first officer both confirmed in their depositions, which I took with translators. Where does that cut? Because how does that relate to the turnover issue? Well, I think it relates to the turnover that if you assume all responsibility for abating a condition, a dangerous condition, which is you're not doing it unless you think it's a problem, then... I don't understand turnover. Educate me. But I don't understand turnover to be a partial issue by issue process. There is a turnover where he says, okay, we're gathering everyone together. This is our ship. You are now responsible for the loading and unloading. And he said, you know, there's going to be icy conditions. Everybody knows there's going to be icy conditions. Your Honor, the turnover requires that you turn over the responsibility for the hold to the crew.  But they didn't. They maintained and retained exclusive control for abating the ice. Had they not done that, I don't think it would be... Active control claim then? Excuse me? Is that your active control claim? I mean, I don't think it's easy to separate those out. But everyone testified. You know, we expected to go to trial and have Murphy testify again that it was Estivadores who retained control of ice abatement. And at trial for the first time, he totally reversed himself. And it was, I think, a defense thing. They just suddenly said, we know we can't get past this document. We know we can't get past the captain and first officer statements. So we'll say, yes, the vessel retains complete control. And that's what they testified to. They said the vessel retains complete control for abating ice. Either ice is a dangerous condition or it's not. The vessel doesn't need to abate it. The district court, I think, found that there wasn't ice in the hold. Is that? The district court did find that, which is inconsistent with this exact exhibit. So is part of your argument then that that was a clearly erroneous finding? It was when the district, what happened is, and the problem with this decision, is Justice Kindred could have taken exhibit ER 103. He could have taken the statements, the deposition testimony, which was admitted. This was admitted by stipulation for all purposes. It's evidence. The captain and first officer's depositions were admitted because they said they were consistent with this. And Judge Kindred could have, in some fashion, parsed through these and said, I'm going to decide to just believe the one foreman for the stevedore gang and a weatherman. But the findings of fact produced that he adopted almost in whole cloth didn't even mention this document. It doesn't admit this key admission that they were abating the ice at the time Mr. Nystrom fell. And it is a difference because they could say it's your responsibility, as Murphy had said initially in his declaration, we take care of that. It's our responsibility. There's turnover. But if you never turn over that responsibility, and captain and first officer said, we always retain control. They had two crews working at the time abating ice. Then they haven't turned over control. You can't turn over part. You can't say, you've got it, but we're going to be abating ice. And they weren't just abating ice. They had videos and pictures of them using mallets to break the ice and remove it, and that was occurring simultaneously with this crew, 15 or so big guys trying to pack tons and tons and tons of fish. And so that was the issue. And just Judge Kindred's adoption in whole cloth of the arguments by defense made no sense given this evidence because it didn't consider it. And the defense can make any argument they want, but it's sort of part of the judge to go, let me weigh the evidence. There was none because he had just adopted it. Further, he adopted the argument, the defense made, that there's an assumption of risk of icy conditions when you work as a longshoreman. And, in fact, that's a comparative fault argument. Well, you know, you're comparatively fault because you kept working when these things were done. The law doesn't allow that. That is not an argument you can make, especially when the vessel is retaining exclusive control to abate the ice. I can see Judge Schriever is going to ask me a question. No. Okay. So we finished the evidence at trial, and I thought, well, we have a good trial here. Murphy has said things I never expected him to say, that, in fact, they didn't have control over this. They never did this. They had never pulled a crew from any vessel ever. He could not recall ever doing that except once it was raining hard and the product was getting wet. So they're going to do whatever they're required to do to move the product. Once the vessel assumes control to abate the ice, it's either a condition that requires abatement or not. They didn't have to do it, but once they did it, they're responsible. And having Korean family and knowing how hard my family and others work, they had the longshoremen doing the work trying to get that fish packed, and they had the crew doing the simultaneous task of trying to clear the ice off the floor. They're not doing that for no reason. It's not a periodic task. They're doing it because it allows the crew to work more safely. And once they do that, they have the obligation to do that in a non-negligent fashion. And it was Justice, Judge Kindred's wholesale adoption of these arguments, including the sort of assumption of the risk argument, which is not the law as I understand it, which for me was clear error, and it made no sense. And I've been trying cases almost 45 years. And I'm licensed in practice in federal courts throughout California, Washington, Hawaii, and Alaska. I'm not an appellate lawyer. I think you can probably tell that. But it's very seldom that I would ever challenge a trial court's decision-making regarding a case. And I think that a different judge could have gone through these facts and produced a decision that would have been against us. But I do not think that the wholesale adoption of the defense's theories, which relied on this contradictory, primarily relied on the contradictory statements of Murphy, and ignored the 103, this relatively contemporaneous document, saying that the crew members were actively de-icing at the time this occurred, and four of them were present when Nystrom fell, and they were de-icing because it was icy, that that was something that showed the vessel either had never turned over, which I don't think if you always hold on to that responsibility, I don't think you can say, well, we turned it over, because you haven't, or alternatively they were exercising active control. That's all I have. Thank you. So we'll give you two minutes for rebuttal. Thank you. Good morning, and may it please the Court. Lee Baxter on behalf of the respondents, Kana Marine and NOK Company Limited. The judgment of the district court should be affirmed because the finding of fact that the slippery floor of the cargo hold in an open cargo hatch in Dutch Harbor was a condition that stevedores expect and routinely encounter and safely navigate was not correct. Counsel, that's actually the source of my question. The statute, as I understand it, Section 905A, specifies that assumption of the risk is not an appropriate defense, and that's what this sounds like to me. You assume the risk that it's going to be slippery. That's your problem. Why is that a permissible or irrelevant finding in the face of the statutory bar on assumption of the risk? Your Honor, a few comments. First of all, 905A deals with first-party claims of stevedores, longshoremen claims under the no-fault workers' compensation scheme against their stevedore employers. That is the section that speaks of that there is no assumption of the risk defense. Second, we are not making an assumption of the risk defense. We're making the argument, and we proved at trial, what Congress has set out under the Longshore Act, which is incorporates longtime historical understandings and obligations between stevedores and vessels. And specifically what that is is that vessels are entitled to rely on stevedores to supply expert and experienced longshoremen who know how to navigate typical, reasonable, manageable hazards. And that's exactly what we have here, that hazard. That was a helpful answer. Thank you. The other question that I have has to do with the way the case evolved. There was a partial summary judgment, as I understand it, on the turnover theory. Am I right about that? Before the rest of the trial took place. And when this conflicting evidence came up, why didn't the district court reopen the question of turnover, or did it? And I'm missing something. Your Honor, we went all the way through trial with this matter, so all of the evidence came in regarding everything from the longshoremen traveling from shore over to climb the Jacobs Ladder onto the ship, going into the hold, performing their stowage activities. So all of that evidence came in. What about, it was Exhibit 103. Yes. Hold on. Was it in the record on this partial summary judgment ruling on the turnover issue? It was, Your Honor, but it implicated the active duty control for several reasons. Namely, the turnover duty implicates and provides what obligations a vessel owes to the longshoremen when cargo operations commence. The turnover duty and the active duty control are actually very easy to distinguish based on my read of the law, the Supreme Court in this Court's decision. The turnover duty provides what the vessel must provide, what shape the vessel must be in when cargo operations begin. We know from Howlett and we know from this Court's decision in Bjarnson that the turnover duty is a temporally limited one. If the condition existed at the time that the longshoremen started stowage, then it can be a turnover duty violation. If the condition arose after the cargo operations began, then at most we're in active duty land. Okay, but then why didn't, you sort of said that that exhibit pertained only to the latter and not to turnover. Why is that? Because even under that exhibit, the captain reported in that, I would quibble that it was a somewhat contemporaneous record. It was written six weeks after the incident. This incident happened on April 30th. That was written in June. The company testified that he wrote that for his company. But it reported that the accident happened long after cargo operations had began. It reported that the slip and fall had occurred at 10 a.m. In reality, we found out at trial and during deposition testimony that the slip and fall happened at 3 a.m., but the slip and fall happened four to five hours after cargo operations began. So Judge Kindred was correct in granting summary judgment because there was no evidence in the record. The plaintiff put forward no evidence, and all the evidence was. There was ice at the time of the turnover. Correct. Is that what would have made the difference? Correct. If exhibit 103 had said, hey, I actually saw this, there was actually ice caked at the time of turnover, then turnover would not have happened? I would not phrase it that way. The turnover duty is what obligations the vessel owes at the time cargo operations begin. There's not a breach of the turnover duty if they don't hand over the ship. It's a breach of a turnover duty if the cargo operations begin and there's an unreasonable hazard present on the ship. How do we determine what's unreasonable when it comes to ice? Because we have statements that you've cited, which is they're used to working in, I don't know if you call them dangerous, but slippery conditions, like that's just what they're, you know, that's common. That's what's going to happen when you're on an icy ship dealing, you know, at that time of day. So is your position that there can never be a breach of the turnover duty if there's a slip and fall on ice? No, Your Honor. First of all, the findings of fact are clear. There was not ice that could be broken up and removed. That's at paragraph 29 of the court's findings of fact. What about 103 then? Because your position is 103. I mean, 103 seems to say they were breaking ice. 103, there's a lot of problems with 103. 103, the court did not credit 103 for several good reasons. It was wrong about fundamental facts of what happened. It was not a contemporaneous record. It was a, as the district court recognized, a supplemental excerpt of record. It is a supplemental excerpt of record 32 and 33. It was a waterfall of hearsay. It was the captain reporting what he had heard from the chief first officer who also did not witness the slip and fall. He had his report from the bosun, the vessel's bosun who takes care of the cargo. There was a waterfall of hearsay in that report. It was wrong about the time of the accident. It was wrong about the accident itself, the reports that Mr. Nystrom hurt his right shoulder. It was actually his left shoulder. It was wrong about several other things that escape me right now. But it was 103. There's a ton of problems with 103. We made those arguments to the district court, and it's no surprise to the district court. And we would review that for clear error. I mean, that would be a trial. That's a trial problem, potentially, that we would give deference to the district court on. Absolutely, Your Honor. The cases are clear that the factual findings were reviewed for clear error. After trial and hearing the testimony. Another problem with 103 is it's very generic. It was not subject to a cross-examination. Okay, so thank you for addressing 103. But I just am trying to get a conceptualization of where a duty ever does arise. Because, on the one hand, the plaintiff seems to be arguing, well, if there's any problem with slippery conditions or ice, you're going to be liable. You violated your turnover duty. And then, on the other hand, you seem to be saying, well, slippery conditions are just part of it. And so that almost leads. I mean, at what point would you be liable? If there was ice, as opposed to slippery conditions, you could have become liable? We could have if they were not. If they existed at the time of turnover. If they existed at the time that cargo operations began and the testimony from experience and experts along shoreline were that they were not, those conditions were not expected and not routinely navigated. Is that the problem here then? Because, as I understand it, you had an expert saying this is all normal, nothing was out of the ordinary here, and the plaintiff never put in an opposite expert. Am I correct about that fact? Yes, but it also can be just longshoremen. We know from the cases. Bjarnson is a case from this court, Bjarnson v. Botello Shipping Company, where the court looked at testimony from a longshoreman who had operated in that area for a long time doing that work. The testimony was, we know how to ask the ship to correct issues, and so we know to do that. We didn't do that here, and so the vessel was not liable for an unreasonable hazard. Another case that I think is really helpful is out of the Eastern District of New York that we cite as the Gigante decision. There again, the court turned to the testimony of expert and experienced stevedores to know what hazards are unreasonably dangerous, and more specifically, they're unreasonably dangerous if an expert and experienced stevedore would not routinely encounter them and be able to safely handle them. And maybe this reflects some of Judge Graber's questions as well. Part of the problem why this is not intuitive necessarily on the turnover issue is these are generally issues of fact that would go to trial, and so I'm trying to understand why that was kicked out on summary judgment. Go ahead. Because there was no evidence of an unreasonable condition at the time cargo operations began. What went to trial was, okay, cargo operations had been underway for several hours, and then Mr. Nystrom slips and falls. At most, that's an active control duty issue because if you never turn over the ship, it's not a violation of the turnover duty if the vessel keeps control of the entire ship. That's not a per se violation of the turnover duty. It is your remaining in active control. Are there turnover duty? They seem to be arguing, and I'm trying to parse out their argument, that turnover is sort of parsed piecemeal. And so I guess giving them the best benefit of the doubt, they're saying, well, everything else was turned over, but the ice was never turned over because the owner of the ship retained responsibility, in his view, to de-ice it and break the ice. I feel compelled to tell you that the court rejected that testimony as incredible, that it rejected it as incredible because Mr. Nystrom was so wrong about every pertinent fact of where the slip and fall happened, who was present. Well, hold on. Back up. Of the duty, is it true that the ship owner retained a duty to break up the ice? No. Okay. That was my question because that seems to be what he's relying on is you said that you were going to take care of it. I understand you've pointed out the problems with 103, but your point is turnover was complete, and if there were ice, it would have been the stevedores' duty to break that up. That is the uncontested testimony from both the president of the stevedoring company, Andrew Murphy, and from the longshoreman gang boss, Joel Gomera, that 100 percent of the responsibility for making sure the floors were safe within the cargo hold was the responsibility of the longshoreman and the stevedore, not the vessel. Counsel, do you agree or disagree with the statement that Murphy's testimony differed from his declaration that there was a conflict in what he said? I do not. I do not agree. Murphy's declaration is an excerpt of record 83 and 84 on this pertinent point about whose responsibility it was, and his testimony is at the supplemental excerpt of record 109 through 117. Murphy's testimony is consistent that the stevedore has complete responsibility for the safety of the floor in the cargo hold. Gang boss Joel Gomera testified that he went and inspected the floor and found it to be fine before the rest of the longshoremen came down there and Mr. Nystrom was hurt. Murphy's testimony, my friend on the other side is making a big point about Mr. Murphy's testimony because he said in his declaration that either the vessel can be down there breaking up ice or the stevedores can be down there breaking up ice, if there is ice, hypothetically. And in his trial testimony he said, we've never broken up ice. My guys know how to work on ice safely. They know how to wear the appropriate footwear and they know how to walk safely on ice, so we never do it. If anyone's doing it, the vessel would be doing it. That's the only, that's the only, it's not a contradiction, but that's the only little difference between the two. Murphy is clear in both of those things that it is 100% the responsibility of the stevedore to provide aid, to make sure that the walking surface is safe. I would argue that all of the factual findings doom the appellant's arguments in this case. The uniform testimonies that experienced Dutch Harbor longshoremen routinely expect this ice and routinely safely manage it by being careful. Ice or slippery conditions? It was a slippery spot. And I've known to not say it exactly right. It was a slippery spot. The court found, and this is again at paragraph 29 of the findings of fact, the court specifically rejected Mr. Neisner's testimony and credited gang boss Gamera's testimony that the deck was not covered in ice. It was a small, slippery spot caused from trace precipitation falling in through the open cargo hold and hitting the cold floor. As any Alaskan could tell you that. So it sounds like it's a little bit of ice instead of a lot of ice, and that matters because? Well, there was no, it matters because there was, the court found that there was not sufficient ice, and ice in a manner such that you'd come down there and break it up, shovel it, and put it in bags and remove it. It was just a small, slippery spot of frost. So another one of the reasons that he rejected Mr. Neistrom's account of the event, that it was an ice sheet. Two other quick points. Plaintiff's complaint about the court's adoption of the vessel's proposed findings of fact and conclusions of law is without merit. Nothing prevents a court from adopting a party's submitted proposed findings of fact and conclusions of law once the court puts their signature on it. That is the court's findings of fact and conclusions. Second, the court did not adopt our findings of fact and conclusions of law wholesale. There are differences. And regardless, the standard review is the same. The factual in this court is clear in all of its decisions that this remains the same. The findings of fact are reviewed for clear error, and conclusions of law are reviewed de novo. The trial court's reference to Steve Adore President's affidavit, its citation to the affidavit in its findings of fact and conclusions of law are, I think I'm out of time. You can finish your point. Okay. First of all, they argue that that was its hearsay and shouldn't have been included. That argument's waived. It was not made below. Can't make it for the first time on appeal. That argument's waived. Second, and more importantly, it was completely harmless. The citation to Mr. Murphy's affidavit was cumulative. If the court looks at Excerpt to Record 25 through 44, it can find all the citations for the trial testimony that match up with the declaration itself. The court should affirm the district court's judgment. Thank you, counsel. I'll just take a couple minutes here. Yeah, hold on. Let me just get the clock set here for you. We're okay? Two minutes. There you go.  Thank you. Mr. Baxter's simply incorrect in his recitation of what happened in the case in the record. I'm going to quote. In his declaration, Andrew Murphy said, quote, the responsibility for moving ice that is formed on a cargo-held deck lies with the gang boss, not with the ship's crew. That was presented on summary judgment. At trial, quote, stevedores never de-ice. It is the ship's crew who de-ices. Murphy was, quote, unaware of his stevedores ever clearing ice, and he had never asked them to do so. Gamera, the gang boss, testified at trial. It's the ship's crew members who break the ice, and they do this when the ice is too much. That's the ship's crews. We always, if ice builds up on the floor, we always, I always call the chief or whoever the crew in there is in the hatch to start breaking it at trial. Captain Chong, by deposition, admitted as trial evidence, and he sat in the trial, and his statement, which is the 103 I talked about, had they had any questions about that, they could have called him, but I didn't think. The problem, counsel, is that a lot of your arguments here seem to go to the act of control issue, and there was a trial held on that, and there was conflicting, at best, there was conflicting evidence presented. That puts you in a tough position because we would have to find that there's no support for the position that active control had remained with the stevedores. The 103, Captain Chong, the first officer's testimony, all was that the ship's crew were actively de-icing and were present when Mr. Nystrom fell. But the district court rejected that. Well, maybe it's right, maybe it's wrong. The district court rejected that. It did not reject it in its findings of fact. It did not explain it. It simply, 103 is not mentioned in the findings of fact, as I recall, not mentioned at all. Well, that's not the only way that you reject something. Well, but it's a, when you have everybody testifying, all of those are saying that the ship's crew is responsible. Murphy has testified in declaration in the summary judgment. No, it's the stevedores. In a trial, everyone says, no, no, it's the ship's crew who always does this. How can they turn over control if they always retain responsibility for de-icing? I mean, I'd like to, you know, it would have been simple if the ship's crew was not involved or it wasn't their primary responsibility, as the captain said, then there could be full turnover. But you can't turn over something if you retain control of a portion, you know, you retain the responsibility to de-ice, and that's what they were doing. And Judge Kindred's decision to ignore all of that evidence and simply choose the one person who said something different, which is Gomera, they didn't have anybody from the ship's crew testify. They didn't have any of the workers for the ship testify. They had one person who worked for the stevedoring company whose boss contradicted himself. He had said before, it's our responsibility at trial. It's never our responsibility. That's the problem, and that's what did not make sense. And it shouldn't be, you know, I agree, lots of deference has to be given to trial court's decisions. But in this situation where, I mean, Nystrom was always consistent about what happened and how he fell. He was confused of where he was because he wasn't experienced with getting on these huge ships. But he was consistent about what he said happened and what happened. It was consistent with 103. It was consistent with the way the deposition testimony was from Captain Chong and the first officer. And Judge Kindred just chose to disregard all of that and disregard the fact that Murphy's testimony had done an entire 180. Either they're responsible or they're not responsible. That's it. Thank you. Thank you very much again for coming. Thank you, counsel. Thanks to both of you for debriefing the argument in this matter. This case is submitted and we'll move on to the final case.
judges: GRABER, OWENS, NELSON